UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
AZZIL GRANITE MATERIALS, LLC,

                    Plaintiff,

               -against-

CANADIAN PACIFIC RAILWAY CORP.,
DELAWARE AND HUDSON RAILWAY COMPANY,
AND NEW YORK AND ATLANTIC RAILWAY,

                  Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

20-CV-2381 (JMW)

**A P P E A R A N C E S:**

Carl Judah Schaerf, Esq.
Cynthia A. Murray, Esq.
**Schnader Harrison Segal & Lewis LLP**
140 Broadway, Ste 3100
New York, NY 10005
*Attorneys for Plaintiff*

Edward Justin Sholinsky, Esq.
Ralph G. Wellington, Esq.
**Schnader Harrison Segal & Lewis LLP**
1600 Market Street, Ste 3600
Philadelphia, PA 19103
*Attorneys for Plaintiff*

David F Rifkind, Esq.
**Stinson LLP**
1775 Pennsylvania Avenue, NW, 8th Fl.
Washington, DC 20006
*Attorney for Defendants Canadian Pacific Railway Corporation,*
*and Delaware & Hudson Railway Company*

Joshua Poertner, Esq.
**Stinson LLP**
50 South Sixth, Ste 2600
Minneapolis, MN 55402
*Attorney for Defendants Canadian Pacific Railway Corporation,*
*and Delaware & Hudson Railway Company*

Kieran M. Corcoran, Esq.
**Stinson LLP**
1325 Avenue of the Americas, 27th Fl.
New York, NY 10019
*Attorney for Defendants Canadian Pacific Railway Corporation,*
*Delaware & Hudson Railway Company, and*
*New York and Atlantic Railway.*

Kyle George Kunst, Esq.
**Gallet Dreyer & Berkey, LLP**
845 Third Avenue, 5th Fl.
New York, NY 10022
*Attorney for Defendants New York and Atlantic Railway*

William A Mullins, Esq.
**Baker & Miller, PLLC**
2401 Pennsylvania Ave, NW, Ste 300
Washington, DC 20037
*Attorney for Defendants New York and Atlantic Railway*

**WICKS,** Magistrate Judge:

> *"[The] prime object [of the Carmack Amendment] was to*
> *bring about a uniform rule of responsibility as to interstate*
> *commerce and interstate commerce bills of lading."*[1]

This case implicates what appears to be one of the more comprehensive federal

regulatory schemes enacted by Congress.  The Carmack Amendment to the Interstate Commerce

Act of 1877 originated in the early twentieth century, having passed into legislation over a

century ago in 1906.  It is widely considered as embodying the congressional intent to take

possession of the field of carrier liability for the shipment of goods in interstate commerce.

---

[1] *Atchison, Topeka & Santa Fe Railway Co. v. Harold*, 241 U.S. 371, 378 (1916).

2

The gravamen of the case involves Defendants' alleged delay or failure to timely deliver stone and return railcars pursuant to a transportation contract between the parties. The stone itself was not damaged, but the delay in returning the railcars to Plaintiff led to damages and ultimately the demise of Plaintiff's business according to the Complaint. Before the Court are the parties' motions and cross-motions for summary judgment (DE 74; DE 76). Specifically, Azzil now moves for partial summary judgment on liability as to its breach of contract claims against Defendants (Counts IV-V). (DE 74.) Defendants in turn cross-move for summary judgment on all counts. (DE 76.) Together the motions raise the following two questions: *First*, are Plaintiff's breach of contract claims within the ambit of the Carmack Amendment? And if so, then *second*, did Plaintiff comply with the procedural requirements of the Carmack Amendment? Simple as these posited questions may seem, they present a Gordian knot.

For the reasons stated below, Azzil's motion for partial summary judgment (DE 74) is denied, and Defendants' cross-motion for summary judgment (DE 76) is hereby granted.

## BACKGROUND

Plaintiff Azzil Granite Materials, LLC ("Azzil") filed this action asserting breach of contract claims against Canadian Pacific Railway Corporation ("CP") and Delaware & Hudson Railway Company ("D&H") (Count IV), and New York and Atlantic Railway (Count V) ("NYA," collectively with CP and D&H, "Defendants"), as well as claims under the Carmack Amendment, 49 U.S.C. § 11706, against Defendants (Count I-III). (DE 1.) Defendants answered the Complaint (DE 29; DE 30) and the parties engaged in discovery. Both sides now claim the case is ripe for summary judgment.

## I.      Relevant Undisputed Material Facts[2]

Azzil sells stone products ("stone") throughout the tri-state area, including New York. (DE 78-1 at ¶ 1.)  On or around July 6, 2016, Azzil entered into a rail transportation contract ("Agreement") with CP for and/or on behalf of D&H (a wholly owned indirect subsidiary of CP), to transport Azzil's stone products.  (DE 78-1 at ¶¶ 3, 5.)  After entering into the Agreement, Azzil began to ship a portion of its stone by rail.  (DE 77-5 at ¶ 11.)  The Agreement was renewed on January 15, 2018.  (DE 77-5 at ¶ 26.)  The Agreement was to transport Plaintiff's railcars from Whitehall, New York or Comstock, New York to Sill, New York or Hicksville, New York, identified in Schedule A of the Agreement.  (DE 78-1 at ¶¶ 5-8.)  The route described in the Agreement is "CPRS-Freshpond, NY-NYA."  (DE 78-1 at ¶ 9.)

CP does not operate on all the lines that run along the route.  (DE 78-1 at ¶¶ 12-14.) NYA provides freight transportation services to its customers over rail lines in Long Island, New York.  (DE 78-1 at ¶ 13.)  Azzil loaded its railcars in Comstock which was near its Quarry.  (DE 77-5 at ¶ 15.)  D&H picked up and transported the stone from the Quarry to Albany, New York

---

[2] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech.,* No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03 Civ. 2746(DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]"  *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

where, another railroad, CSX, would take the stone and transport it to Fresh Pond, New York to hand off to NYA.  (DE 77-5 at ¶¶ 16-18.)  D&H and CSX were transporting the stone on behalf of CP, and NYA then divided up the railcars and transported them to their respective destinations in Long Island.  (DE 78-1 at ¶ 16.)  After the railcars were emptied at their destination in Long Island, the process reversed, and NYA was responsible for returning the empty railcars to Fresh Pond.  (DE 78-1 at ¶ 17.)  The railcars were provided by Azzil and were leased from another company.  (DE 78-1 at ¶ 33.)

The Agreement states that it incorporates by reference CP's "Tariff 1," and requires claims related to CP's liability to Azzil "or any third party for claims involving any alleged loss, damage or delay to the [stone] shall be the same as that specified in the Liability Regulations and clarified in CP's Guide to Products and Services Tariff 1 under the Rules and Regulation section . . ."  (DE 77-5 at ¶ 38-39; DE 74-4 at 3, 4.)  Tariff 1 provides that "[f]or transportation of Commodities within the United States, CP's liability for claims and the procedures for processing such claims, shall be the same as that specified in [the Carmack Amendment], except as otherwise provided herein."  (DE 77-5 at ¶ 40.)  Tariff 1 also states that notice of claims for loss, damage, or delay must be received "within nine (9) months from the date of delivery" along with certain documentation.  (DE 77-5 at ¶ 39.)  NYA's Tariff NYA 8000-B is also incorporated, which requires notice within 12 months.  (DE 50 at ¶¶ 38-39.)

The Agreement contains a "Minimum Volume Commitment" requiring Azzil to ship no fewer than 1,500 railcars per year, that, if not met, would give CP the ability to assess liquidated damages.  (DE 78-1 at ¶ 18-19.)  Schedule A provides that "CP will do best commercially reasonable efforts to return all cars within 2 to 4 days available on our line—or according to trip plan in place at the moment of movement."  (DE 78-1 at ¶ 10.)  Azzil experienced service issues

5

related to delivery and return of its railcars and made inquiries about the status and whereabouts of certain railcars.  (*See* DE 78-1 at ¶¶ 45-47; DE 74-22; DE 74-23.)

On July 3, 2018, Azzil notified NYA that there were issues regarding moving railcars from out of the Hicksville rail yard, and that a certain number were backed up there.  (DE 74-23.)  NYA stated they would "look into" resolving the issues.  (DE 77 at 11.)  On August 7, 2018, Azzil notified CP via CP's customer service line and advised that certain railcars arrived back to Comstock fully loaded, and that this had happened four times before.  (DE 74-22.)  Azzil noted that the issue would cost the company $7,420 and asked CP to ensure Azzil is not charged demurrage/moving costs for the identified railcars or any that are delayed because of the issue.  (*Id.*)  On August 16, 2018, Azzil emailed NYA letting them know it has received poor service over the last month.  (DE 74-26.)  Azzil attached a spreadsheet identifying 80 loaded railcars that had been sitting in Fresh Pond for periods of time varying from 3 days to 35 days.  (*Id.*)  Azzil further noted it had not received a railcar in over a week, it had sent numerous emails requesting a status update, and that it was told that NYA would resolve the issue as soon as possible, yet it had not been resolved.  (*Id.*)  NYA acknowledged that it "was not happy about sitting on [Azzil's] railcars either."  (*Id.*)

Given these issues, the Agreement was not renewed when it expired in January 2019, at which point Azzil ceased shipping stone by rail.  (DE 77-5 at ¶ 30.)  Azzil has provided a spreadsheet reflecting that by the time the Agreement expired, more than 100 of its 150 railcars were either at Whitehall, NYA's Hicksville terminal, or Fresh Pond.  (DE 74-28.)  Azzil defaulted on its railcar leases due to not receiving them back when expected.  (DE 78-1 at ¶ 35.)  Azzil had also created a multi-year proposal, dated December 10, 2018, to provide stone to the LIRR 3rd Track Contractors.  (DE 74-29 at 2.)  The parties dispute whether there was any actual

contract in place.  The proposal was valued at $17 million and was in the form of an unsigned

quote.  (DE 74-29 at 2.)  Azzil asserts it was unable to ship stone as intended given the service

issues and lack of railcars.  Azzil's 30(b)(6) witness testified that Azzil started doing "smaller

up-front contracts" and when it was unable to supply stone, the LIRR 3rd Track Contractors

stated they would no longer use Azzil.  (DE 74-21 at ¶ 149.)

On April 11, 2019, CP received a notice from Azzil invoking the mediation clause of the

Agreement and asserting that CP had breached the Agreement with Azzil by "delaying transport

of and failing to transport Azzil's products," resulting in continuing financial losses to Azzil.

(DE 50-23 at 2.)  On May 2, 2019, CP informed Azzil by letter in response to the mediation

demand that:

> Azzil is required to comply with the claim procedures set out in CP's Tariff 1 …
> CP has no record of a disputed or unresolved claim for loss or delay filed by Azzil.
> If you believe this to be inaccurate, please provide evidence of claims filed in
> accordance with Tariff 1.

(DE 76-2 at ¶ 52; DE 76-7.)

On May 14, 2019, Azzil responded with a letter explaining that it intends to initiate

mediation pursuant to the Agreement.  (DE 76-8.)  Azzil eventually filed for bankruptcy on June

12, 2019 in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy

Court").  (DE 77-5 at ¶ 36.)  On November 27, 2019, Azzil filed an action against Defendants in

the Bankruptcy Court, which was dismissed for improper venue.  (DE 77-5 at ¶ 38.)

Azzil filed the instant Complaint on May 29, 2020.  (DE 1.)  Defendants moved to

dismiss, and the motion was denied in part but granted in part as to Azzil's fraudulent

inducement claim (Count VI) at the August 26, 2020 Pre-Motion Conference before Judge

Brown.  (DE 24.)  Defendants filed their Answers on September 23, 2020.  (DE 29; DE 30.)  The

parties engaged in discovery.  On April 22, 2022, the parties requested a pre-motion conference

regarding their anticipated summary judgment motions.  (DE 51; DE 52.)  At the July 12, 2022

pre-motion conference, a potential conflict was discovered, which resulted in the parties' request

that Judge Brown recuse himself from the case, and the parties' subsequent consent to the

jurisdiction by the undersigned.  (DE 67–70.)

     The parties appeared before the undersigned at the August 17, 2022 pre-motion

conference, and the Court set a briefing schedule on their anticipated motions for summary

judgment (DE 72), which were subsequently filed on November 11, 2022.  (DE 74; DE 76.)

The parties appeared for oral argument on the instant motions on January 26, 2023, at 10:00 AM

in Courtroom 1020 before the undersigned.  (DE 81.)[3]  The parties' arguments were heard and

the Court reserved decision.  (*Id.*)

## LEGAL STANDARD

     Summary judgment must be granted when there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine

dispute of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The initial burden is on the movant to demonstrate the absence of a genuine issue of material

fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim.

*Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138,

148 (2d Cir. 2004).

     Once the movant meets its initial burden, the nonmovant may defeat summary judgment

only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P.

---

[3] *See generally* Recording of Oral Argument at 10:18-11:21, *Azzil Granite Materials, LLC v. Canadian Pacific Railway Corporation et al.*, No. 20-cv-02381 (JMW) (E.D.N.Y. Jan. 26, 2023) (on file with the Court) (hereinafter "Oral Argument").

56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York¸* 316 F.3d 93, 100 (2d Cir. 2002).  The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in its favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact.  *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to determine whether triable issue of fact exist.  That is, the court's function is "issue finding," not "issue resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

In considering multiple motions for summary judgment, "the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Quanta Lines Ins. Co. v. Investors Cap. Corp.*, No. 06-cv-4624 (PKL), 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) (citing *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment)).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

Azzil seeks only partial summary judgment as to Defendants' liability on its breach of contract claims brought separately against CP and D&H (Count IV), and NYA (V).  Defendants respond in kind, except that Defendants also seek summary judgment as to all of Plaintiff's

claims -- the Carmack Amendment claims (Counts I-III), and the breach of contract claims (Counts IV-V).  The Court addresses these two sets of claims in turn.

The threshold questions are whether: (1) Azzil's breach of contract claims are preempted by the Carmack Amendment, and (2) whether Azzil satisfied the required Carmack notice or can claim an exception to the notice requirement.

## I.  Breach of Contract Claims (Counts IV-V)

Azzil seeks to hold Defendants liable for their failure to use "best commercially reasonable efforts" to return its railcars within 2 to 4 days as allegedly required under the Agreement.  (DE 1 at ¶¶ 109, 110, 117, 118.)  Defendants contest this allegation and further argue that Azzil's breach of contract claims are preempted by the Carmack Amendment.  (DE 76-1 at 22-23; DE 78 at 8-10.)  Azzil disagrees, arguing that its breach of contract claims are about Defendants' delay or failure to timely return railcars whilst its Carmack claims are about Defendants' delay or failure in timely delivering stone.[4]  (DE 74-1.)  Azzil asserts that the breach of contract claims do not arise from any loss or damage incurred during shipping.  (DE 77 at 16.)  Azzil further contends that Defendants have waived any preemption defense that may have been available.  (DE 74-1; DE 77.)

### A.  Does the Amendment Preempt Plaintiff's Claims?

The Carmack Amendment to the Interstate Commerce Act of 1877 provides in relevant part:

> A carrier providing transportation or service . . . shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading. The

---

[4] Azzil's Complaint includes allegations regarding a failure to return the railcars as part of its Carmack claims.  (*See generally* DE 1.)  During Oral Argument, Azzil stated that its Carmack claims (Counts I-III) are strictly for the delay of the product reaching the customers, and do not seek any damages as to the return of its railcars.  (Oral Argument at 10:23-24.)

10

liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, [or] (B) the delivering carrier  . . . . Failure to issue a receipt or bill of lading does not affect the liability of a carrier.

49 U.S.C. § 14706(a)(1).

The Carmack Amendment "addresses the subject of carrier liability for goods lost or damaged during shipment, and most importantly provides shippers with the statutory right to recover for the actual loss or injury to their property caused by any of the carriers involved in the shipment." *Cleveland v. Beltman N. Am. Co.*, 30 F. 3d 373, 377 (2d Cir. 1994).  "In enacting it, Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability."  *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n.6 (2d Cir. 2001).  The Carmack Amendment accomplished this task in two ways. *Id*.  First, by "establishing a single uniform regime for recovery by shippers 'directly from [the] interstate common carrier in whose care their [items] are damaged . . . .'"  *Id*. (internal citation and quotation marks omitted).  Second, by "preempting [the] shipper's state and common law claims against a carrier for loss or damage to goods during shipment."  *Id*.

 It is well established that the Carmack Amendment completely preempts state law as to claims arising from the shipment of goods in interstate commerce and has been broadly interpreted by the Supreme Court.  In the often-cited *Adams Express Co.*, the Supreme Court stated:

> [The Carmack Amendment] embraces the subject of the liability of the carrier under a bill of lading . . . . Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it.

*Adams Express Co. v. Croninger*, 226 U.S. 491, 505-06 (1913).

Indeed, "the words of the [Carmack Amendment] are comprehensive enough to embrace responsibility for all losses resulting from any failure to discharge a carrier's duty as to any part

11

of the agreed transportation . . . ."  *Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196 (1916); *see also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981) ("The Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes.…").  This area of law has also been described by the Second Circuit as "an area of interstate commerce law that has been fully occupied by Congress' passage of a statute delineating what remedies are available, leaving no room for additional state or federal common law causes of action."  *Cleveland v. Beltman N. Am. Co*., 30 F.3d 373, 374 (2d Cir. 1994); *see also North American Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233-34 (2d Cir. 1978) ("Congress has created a broad, comprehensive scheme covering the interstate shipment of freight . . . [t]his has occupied the field to the exclusion of state law.").

"Carmack applies both to claims of damage or loss while goods are in interstate transit, but also to related services, including arranging for, receiving, delivering, storing, handling, packing and unpacking such goods."  *See Brody v. Liffey Van Lines, Inc.*, No. 13-CV-5719 (CM), 2014 WL 2450807, at *4 (S.D.N.Y. May 27, 2014).  It covers claims for damage or loss incurred due to delays  or failure to deliver.  *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 387 F. Supp. 2d 197, 201 (W.D.N.Y. 2005) ("[T]he Carmack Amendment, which, as explained, covers losses caused by delays in shipping."); *Hall v. N. Am. Van Lines, Inc*, 476 F.3d 683, 688 (9th Cir. 2007) (finding delay and failure to deliver covered under the Carmack Amendment).

However, "[s]ome courts have held that 'claims based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption' under the Carmack Amendment."  *RDK NY Inc. v. City of New York*, No. 21-CV-1529 (EK) (RER), 2023 WL 348467, at *4 (E.D.N.Y. Jan. 20, 2023) (citing *Smith v. United Parcel Serv.*, 296 F.3d 1244,

1249 (11th Cir. 2002) (collecting cases)); *see also Koch v. McConnell Transp. Ltd.*, No. 13-CV-3016 (LDW), 2015 WL 3470182, at *6 (E.D.N.Y. May 29, 2015) (same).

The question presented here is whether Azzil's claims for breach of contract based on Defendants' failure to timely return empty railcars are preempted by the Carmack Amendment. Defendants primarily rely on *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 387 F. Supp. 2d 197, 201 (W.D.N.Y. 2005) ("*Rock Salt II*"). (DE 78 at 9-10.) There, the court held that plaintiff's state law contract claims were preempted by the Carmack Amendment "including claims arising out of shipment delays. . . ." *Id*. at 201. Defendants argue the facts of *Rock Salt II* are virtually the same -- the court's 2001 decision on the defendants' motion to dismiss explains the underlying facts. *See Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 180 F. Supp. 2d 420 (W.D.N.Y. 2001) ("*Rock Salt I*.")

The *Rock Salt* duo decisions reveal that plaintiff there complained of very similar conduct as that here. Specifically, the plaintiff alleged delays to salt shipments on the defendants' lines, with an increase in the "average 'turn time'" required to make round trips between two points, and as a result of those delays, expenses the plaintiff incurred, for example, "attributable to additional days of railroad car rental." *Rock Salt I*, 180 F. Supp. 2d at 422. Moreover, the plaintiff alleged that it "was also forced to rent trucks to ship its product when rail service was unacceptably delayed. [Plaintiff] also claim[ed] to have lost business and profits as a result of its inability to make deliveries on time." *Id*.

Azzil attempts to distinguish *Rock Salt* (DE 75 at 5) on the basis that the claims dealt with the carrier's failure to "provide services and deliver [plaintiff's] products in a timely manner." *Rock Salt I*, 180 F. Supp. 2d at 422. But the same species of allegations underpin Plaintiff's contract claims. For example, Azzil asserts that Defendants failed to "return all

13

railcars within 2 to 4 days" and instead "took weeks and sometimes longer," and failed to return

them so that "Azzil could refill them with orders for customers." (DE 1 at ¶¶ 109, 110, 117,

118.) Though Azzil argues that Defendants' delay in delivering railcar shipments to end users

only supports their Carmack claims (DE 74 at 6), the aforementioned allegations, which are

rooted in Defendants' failure to return railcars for them to be refilled and shipped to end users,

essentially deal with the same issue.

Azzil relies primarily on an unpublished case from the United States District Court for

the Western District of Virginia, *Southern Coal Corp., v. Norfolk Southern Corp*, No. 2:11-cv-

00002, 2011 U.S. Dist. LEXIS 85413, at *8 (W.D. Va. Aug. 2, 2011). There, the court found

that the Carmack Amendment did *not* cover plaintiff's claim that defendants failed to provide

railcar service since it only covers claims for "'freight loss or damage incurred during shipping,'

and not for freight delays due to failure to provide railcar service, as alleged in the complaint."

*Id*. (citing *Rock Salt I*). In *Southern Coal*, plaintiff alleged "breaches of the transportation

contract and statutory obligations due to defendants' failure to provide timely railroad service to

plaintiffs. Plaintiffs allege[d] that Defendants ha[d] not provided enough rail cars for the

transport of coal as agreed to in the transportation contract." *Id*. at *2.

Defendants distinguish *Southern Coal* on the basis that it involved the failure to supply

*carrier-owned* railcars that were not part of the transportation component of the contract. The

obligation in *Southern Coal*, they argue, preceded the bill of lading and the transportation

contract. Whereas the Agreement here, provides for the transport of railcars supplied by Azzil as

part of the transportation contract, not separate or apart from it. (Oral Argument at 10:25-28.)

Defendants also note that *Southern Coal*'s discussion of preemption is arguably dicta since the

case was decided on a motion to remand, a jurisdictional basis.  Furthermore, no reported decision cites the case.

Southern Coal itself cited Rock Salt -- a case that concerned the same "turn time" issue, where the plaintiff, as here, also claimed lost business, profits, and increased rental car costs due to a failure to return loaded and empty cars -- claims that were found to be preempted.  (DE 79 at 7-8.)  The Court agrees that Southern Coal is distinguishable for the aforementioned reasons, and the persuasive authority cited by Defendants within the Second Circuit -- Rock Salt -- is far closer to the mark and guides the rule of decision here.

Ultimately, the allegations underpinning Azzil's Carmack claims and breach of contract claims are closely related, and the claims are about actions by Defendants that impeded Azzil's stone shipments, shipments that were being made pursuant to the Agreement.  Prior to entering into the Agreement, Azzil used non-rail methods to ship its stone.  (DE 77-5 at ¶ 11.)  The purpose of the Agreement was to ship stone via rail.  (DE 78-1 at ¶ 5.)  Azzil leased railcars to this end.  (DE 78-1 at ¶ 33.)  Azzil's Carmack claims are straightforward.  The Carmack claims involve Defendants' alleged delay or failure to timely deliver railcar shipments to end users and get its stone to the market.  (DE 1 at ¶¶ 91-92, 97-98, 103-104.)

Though Azzil's breach of contract claims are framed differently, au fond they involve the same core issues.  Azzil's breach of contract claims are about Defendants' alleged failure to fulfill their contractual obligation to use "best commercially reasonable efforts to return all cars within 2 to 4 days."  (DE 74-1 at 12.)  Defendants allegedly failed to return, or took much longer to return, the railcars.  (DE 1 at ¶¶ 109-10, 117-18.)  As a result, Azzil was unable to use those railcars to make, or timely make, further shipments to end users and bring its stone to the market via railcar under the Agreement.  (DE 74-12; Oral Argument at 10:30.)  After all, Defendants

15

were Azzil's way of getting stone to customers via railcar under the Agreement.  The effect of both sets of claims is the same, Azzil was delayed in bringing and could not bring its stone to market because of Defendants' alleged delays or failures.

Notably, Azzil itself repeatedly frames its breach of contract claims in a way that is not materially different than its Carmack claims.  (*See* DE 74-1 at 5 ("Defendants' actions destroyed Azzil's business, because without railcars to transport goods—the very purpose of the agreement—Azzil *could not bring its product to market*.") (emphasis added); DE 75 at 3 ("Defendant's failure to 'use [best commercially reasonable efforts] to return Azzil's cars *so that Azzil could refill them with orders for customers*' is the basis of the contract claims." (emphasis added)).  Thus, these claims are inevitably linked to Azzil's Carmack claims.

Azzil's assertion of damages and financial losses underscore the similarities between the Carmack and breach of contract claims.  For example, Azzil was allegedly unable to ship stone to end users as intended, and faced financial losses, *inter alia*, losing an allegedly $17 million dollar contract.  (DE 74-29 at 2.)  Specifically, Azzil's 30(b)(6) witness testified that Azzil started doing "smaller up-front contracts" with the LIRR 3rd Track Contractors and when it was unable to supply stone, the LIRR 3rd Track Contractors stated they would no longer use Azzil.  (DE 74-21 at ¶ 149.)  Did Azzil lose this alleged contract because of Defendants' delay or failure to timely deliver railcars loaded with stone to the LIRR 3rd Track Contractors?  Did Azzil lose this alleged contract because Defendants' delay or failure to timely return empty railcars so that Azzil could load them with stone, and hand them to Defendants to deliver to the LIRR 3rd Track Contractors?  A mix of both?  How are the resulting damages different?

Further, Azzil argues that the Carmack Amendment only preempts claims as to loss or damage to goods during transport, and not claims separate and distinct from the delivery, loss, or

16

damage to goods.  (DE 74-1 at 12.)  Courts have found both delay in delivery even without property loss or damage, *Hall v. N. Am. Van Lines, Inc*, 476 F.3d 683, 688 (9th Cir. 2007) (noting that the Fifth Circuit has found late delivery of goods to be preempted (citing *Moffit v. Bekins Van Lines Co.*, 6 F.3d 305, 306–07 (5th Cir. 1993)), and the refusal to deliver to be the types of claims preempted by the Carmack Amendment.  *Id.* (finding a refusal to deliver claim completely preempted and holding that "the Carmack Amendment is the exclusive cause of action for contract claims alleging *delay*, loss, *failure to deliver* or damage to property" (emphasis added)); *see also RDK NY Inc. v. City of New York*, No. 21-CV-1529 (EK) (RER), 2023 WL 348467, at *3 (E.D.N.Y. Jan. 20, 2023) (noting that the Carmack Amendment covers "refusal to deliver" (citing *Hall*, 476. F.3d at 688)); *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1249 (11th Cir. 2002) (finding claims of "fraud, negligence, wantonness, or willfulness, and outrage all arise from" defendant's failure to deliver packages, and thus, are preempted by the Carmack Amendment because even though plaintiff sought "a remedy for an injury to their person, the claim results solely from the loss of and misdelivery of their goods.").

Here, Azzil's breach of contract claims can just as easily be re-characterized as claims for delayed shipments, or ultimately, Defendants' failure to deliver further shipments under the Agreement to end users, resulting from Defendants' delay or failure to timely return railcars. Azzil's claims of delay in returning the railcars as provided for under the Agreement regarding transportation of stone so that Azzil can refill them and send more stone to end users are simply too intertwined with its claim that Defendants delayed or failed to transport stone to end users. For the Court to allow Azzil to escape preemption by creatively reframing its claims, and then "making finer distinctions between types of contract damages would defeat the purpose of the

statute, which was to create uniformity out of disparity." *Hall*, 476. F.3d at 688. (internal quotation marks omitted).

Moreover, Azzil's claims of delay cited here are far afield from the types of claims that courts have found to be separate and distinct from those preempted by the Carmack Amendment. *See e.g.*, *Chicago, R.I. & P. Ry. Co. v. Maucher*, 248 U.S. 359 (1919) (did not preempt claims of injury to a passenger); *Koch*, 2015 WL 3470182, at *7 (did not preempt negligence claims where the "gravaman of th[e] negligence claim [was] that the Defendants were negligent in the packing and unloading of the trees, which caused Decedent's death").

The Agreement was to transport stone to market, the delay or failure to timely do so is at the center of all of Azzil's grievances.  Assume for a moment that Defendants had timely delivered all the railcar shipments to end users, and Azzil met the minimum volume commitment as contemplated in the Agreement.  Would Azzil still be able to assert, as it does now, that it was unable to transport stone to end users because of Defendants' delay or failure to timely return railcars?  At bottom, Azzil's claims are not separate and distinct from Defendants' alleged delay or failure to timely transport and deliver stone under the Agreement such that these claims escape preemption.

Considering the foregoing and the wide reach of the Carmack Amendment, the Court concludes as a matter of law that Azzil's breach of contract claims are preempted by the Carmack Amendment.

The Court next turns to Azzil's contention that Defendants waived their preemption defense.

### B.  Did Defendants Waive the Affirmative Defense of Preemption?

Federal preemption is an affirmative defense that a party is required to raise in their responsive pleading.  *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 3000963, at *5 (S.D.N.Y. July 10, 2019) (citing Fed. R. Civ. P. 8(c)).  However, the failure to timely plead federal preemption is not necessarily fatal to that affirmative defense.  "[A] district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings."  *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003).

Azzil alleges that because Defendants failed to include preemption as an affirmative defense in their responsive pleadings, they have waived the defense, and it should be stricken by the Court.  (DE 74-1 at 16.)  First, Defendants contend that CP's Answer repeatedly asserts that Azzil's claims are governed by the Carmack Amendment, and that no magic words are needed to preserve the defense.  *See Diamond v. Fed. Emergency Mgmt. Agency*, 689 F. Supp. 163, 167 (E.D.N.Y. 1988) (finding no waiver where defendant's answer noted that plaintiff lacked standing to the bring the suit, which "appears as an affirmative defense" and "sufficiently preserved" the federal preemption issue for trial).

The Court finds that the affirmative defense has not been waived under the circumstances presented.  For example, CP's Answer specifically notes (1) that Azzil failed to provide the required written notices under, *inter alia*, "the Carmack Amendment," (2) the relief sought is barred by the statute of limitations under "the Carmack Amendment," and (3) liability to Azzil is limited by Section 10.1 of the Contract, which incorporates Tariff 1, which states that liability is the same as specified in the Carmack Amendment.  (DE 30 at ¶¶ 4, 8, 13.)  These statements are

19

then incorporated by reference in CP's response to the breach of contract claims.  (DE 30 at ¶¶ 106, 120.)  These statements put the Court (and more importantly Plaintiff), on notice that the Carmack Amendment has been invoked in response to the claims.

Defendants also rely on having argued preemption during the August 25, 2020 pre-motion conference before Judge Brown on their motion to dismiss, and though Judge Brown declined to reach that argument early on, he expressly reserved Defendants' right to seek summary judgment on Carmack preemption after discovery:

> So with that in mind, I am granting the motion in part, that is as to the fraudulent inducement claim. Whether the breach of contract and Carmack are mutually exclusive here, plaintiff has raised the specter that they're - those claims apply to different facts, and circumstances, so for today's purposes, I am not going to dismiss either the breach of contract or the Carmack claim, or I guess it will be the breach of contract claim that's being precluded. I'm not going to do that today, although I am not going to preclude defendant from coming in later and saying, Judge, there's no breach of contract claim here, if that's important to you, after doing some discovery on the factual issues.

(DE 78-1 at ¶ 69; 75-1 at ¶ 69 (admitted)).

Notably, Azzil in its reply does not address Defendants' arguments regarding their preservation of the preemption defense.  (DE 75.)  As such, the Court finds that Defendants did preserve their ability to raise preemption.  Even if they had not, Azzil was on notice of this defense and there is no surprise or prejudice to Azzil that bars them from raising this defense now.  Azzil in its moving papers affirmatively addressed this waiver argument, which indicates it was neither surprised, nor would it be prejudiced, by Defendants' assertion of preemption.  (DE 78 at 13.)

In sum, Azzil's breach of contract claims are preempted by the Carmack Amendment, and all of Azzil's Carmack claims are time-barred as discussed below.  *See infra* II. Accordingly, Azzil's motion for summary judgment as to Defendants' liability on the breach of

20

contract claims (Counts IV-V) is denied, and Defendants' motion for summary judgment as to those claims is granted.

## II.      Carmack Claims (Counts I-III)

Having concluded above that the Carmack Amendment applies to all claims, the Court next considers Counts I-III.  Defendants argue that they are entitled to summary judgment on Azzil's Carmack claims because Azzil never submitted a notice of claim for any shipment as required under the Carmack Amendment, and thus, those claims are time-barred.  (DE 76.) Defendants also argue that Azzil has not set forth a *prima facie* case under the Carmack Amendment and has failed to provide any evidence of a breach of service obligations under the Agreement.  (DE 76.)

The crux of Azzil's Carmack claims is Defendants' failure to timely deliver nearly all the shipments of stone to end users and customers, which in turn, caused significant losses to Azzil. (DE 77 at 9.)  Azzil argues that summary judgment is inappropriate since genuine issues of material fact remain as to: (1) whether any of the exceptions to the Carmack Amendment's strict notice requirement apply ("Carmack notice"), and (2) whether the parties' communications regarding delayed shipments triggered Defendants' duty to investigate the claims.  (DE 77.)

### A.  Carmack Notice and Applicable Exceptions

There are strict notice requirements under the Carmack Amendment for presenting claims.  The claim must provide the carrier with "a written or electronic communication within the time limits specified in the bill of lading or contract of carriage or transportation":

> Containing facts sufficient to identify the baggage or shipment (or shipments) of property, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage; ....

49 C.F.R. § 1005.2.

The notice provisions are strictly enforced in the Second Circuit. *See Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900, 904 (2d Cir. 1980), *cert denied*, 450. U.S. 915 (1981). In *Pathway Bellows*, the court found that a letter sent by the plaintiff was not a proper written claim because it failed to assert that the defendant "was liable for any loss, and it failed to claim a specified or ascertainable amount of money as damages." *Id*. at 903. Moreover, the court noted that the district court erred in finding the letter was timely filed because even though it was filed just one day after the nine-month period, it was untimely, and thus, defendants were "entitled to prevail on their motion for summary judgment." *Id*. at 904-05.

CP's contract for carriage requires notice within nine months of movement. (DE 77-5 at ¶ 38-39; DE 74-4 at 3, 4 .) CP's Tariff 1 is incorporated into the Agreement and adds to the minimum Carmack notice requirements by requiring a "a) Bill of Lading and paid freight invoice; [and] b) Invoice showing ownership and costs," and NYA's Tariff NYA 8000-B is also incorporated, which requires notice within 12 months. (*Id*.) The Agreement expired as of January 2019. (DE 77-5 at ¶ 30.)

Notice is required for *each* shipment even where the contract involves a series of shipments. *See Am. Rock Salt Co., LLC v. Norfolk S. Corp*., 387 F. Supp. 2d 197, 204 (W.D.N.Y. 2005). However, even just looking at the date the Agreement was terminated -- January 2019 -- at minimum, notice was required within nine months thereafter to CP or within 12 months to NYA. Defendants argue that Azzil never submitted, let alone timely submitted, a notice of claim for any of the shipments that meets the minimum Carmack notice requirements. (DE 76-1 at 12.) Defendants note that of the responsive documents produced in discovery related to the question of notice, only three were even addressed to CP. The first reflects Azzil

seeking assistance regarding an issue with ordering cars from the railyard to load at the quarry, and the second and third involve Azzil asking CP to not impose certain charges related to loaded rail cars that returned back to the quarry still loaded.  (DE 76-1 at 17.)  Azzil argues that contrary to Defendants' assertions, Azzil repeatedly identified shipments by car number.  (DE 77 at 4.)

Azzil did send communications identifying certain shipments by railcar number.  (*See, e.g.*, DE 74-26.)  Azzil also requested updates about certain railcars and was told by, for example, NYA that it would resolve the issue as soon as possible.  (*Id*.)  Azzil also notified CP that certain loaded railcars had been returned fully loaded.  (DE 74-22.)  However, there is no genuine issue of material fact that Azzil did not strictly comply with Carmack notice.  Azzil fails to explain how these communications fully complied with the notice requirements including the requirement that the written notice state a claim for a specified or ascertainable amount of damages or the requirement that the notice assert that Defendants are liable.  Indeed, Azzil conceded at Oral Argument that it did not strictly comply with the Carmack notice.  (*See* Oral Argument at 10:48-49 ("There was no formal notice . . . I'm not going to get up here, Your Honor, and tell you that there was perfect Carmack notice . . . we are down to the exceptions . . .").)  Thus, to withstand summary judgment, Azzil must show there are genuine issues of material fact as to whether an exception to the notice requirement is applicable.

Azzil argues that two exceptions recognized by the Second Circuit in *Pathway Bellows* apply in this case that excuse a shipper from timely filing a written claim: "(i) a carrier is estopped from requiring a shipper's strict compliance with the written claim requirement when the carrier's conduct misleads the shipper into believing that there is no need to file a claim, and (ii) a carrier is excused from filing a written claim when the shipper could not, in the exercise of

reasonable diligence, have ascertained the extent of its loss within the nine month claim filing period."  (DE 77 at 10.)

In *Pathway Bellows*, the Court noted that:

Had any conduct on the part of Penn Central misled Pathway Bellows into believing that there was no need to file a claim, or that the letter of May 12, 1975 was sufficient to constitute a claim, Penn Central might be held estopped from insisting on Pathway Bellows's compliance with the timely written claim requirement contained in the bill of lading. Similarly, if Pathway Bellows could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9 month claim filing period, untimely filing of a completed claim might be viewed as excusable.

*Pathway Bellows*, 630 F.2d at 905 n.10 (internal citations omitted).

Azzil argues that genuine issues of material fact exist as to both exceptions.

### i.    *Estoppel Exception*

Azzil states that Defendants are estopped from requiring strict compliance with Carmack notice because of evidence that they allegedly led Azzil to believe it was unnecessary to file a claim.  Azzil states it made repeated inquiries with both CP and NYA as to the status and whereabouts of its railcars, and in response, Defendants never indicated that the emails, phone calls, or in-person meetings did not constitute notice or that a different method of communication was necessary to make a claim.  (DE 77 at 11.)  Further, Azzil argues that Defendants stated they would "look into" resolving the issues.  (DE 77 at 11.)  Defendants argue that Azzil's argument is not that Defendants told it not to file, but rather that Defendants' silence misled it into believing it was unnecessary to file a claim, which is insufficient to survive summary judgment. (DE 79 at 7.)

Estoppel applies where there is "evidence that the carrier told the shipper not to file or *otherwise led it to believe that filing was unnecessary to have its claim satisfied.*"  *Ideal Steel Supply Corp. v. Jan Trucking & Rigging*, No. 04-CV-1196 (TCP) (ARL), 2006 U.S. Dist. LEXIS

24784, at *16 (E.D.N.Y. Apr. 26, 2006) (quoting *Imperial News Co. v. P-I-E Nationwide, Inc.*, 905 F.2d 641, 645 (2d Cir. 1990)).  "[T]o prevail on an estoppel theory, [plaintiff] would have to prove that defendant's employees made misleading representations and that plaintiff failed to file a timely claim as a result of its reliance on those representations," and the Court "must be mindful that, '[e]stoppel, within the context of the mandatory, statutory and regulatory scheme, should not be lightly found.'"  *R.T.A. Corp. v. Consolidated Rail Corp.*, 594 F. Supp. 205, 210 (S.D.N.Y. 1984) (citations omitted).  Estoppel requires "affirmative misrepresentation that filing a claim was unnecessary," silence alone is insufficient to invoke estoppel.  *Consol. Rail Corp. v. Primary Indus. Corp.*, 868 F. Supp. 566, 580 (S.D.N.Y. 1994).

In *Ideal Steel*, the court found genuine issues of material fact regarding estoppel where plaintiff argued that that one of defendant's General Managers told it they "should just go ahead with filing suit," and though defendant denies such statement, the question of credibility raised was one for the jury.  *Ideal Steel Supply Corp. v. Jan Trucking & Rigging*, No. 04-CV-1196 (TCP) (ARL), 2006 U.S. Dist. LEXIS 24784, at *16 (E.D.N.Y. Apr. 26, 2006).  In *Imperial News*, the court noted that "[e]stoppel is not to be found lightly," and plaintiff's claims that it repeatedly called defendant and defendant "did not tell it to file a notice of claim," were insufficient since defendant "had no duty to notify [it] of its own contractual obligations." *Imperial News Co., Inc. v. P-I-E Nationwide, Inc.*, 905 F.2d 641, 645 (2d Cir. 1990).

First, Azzil conceded at Oral Argument that Defendants never told them not to file a claim.  (Oral Argument at 10:51.)  Thus, Defendants did not make any express affirmative misrepresentations to Azzil regarding the filing requirement.  Second, Azzil's repeated communications combined with Defendants' silence alone is insufficient to establish estoppel. For the exception to apply, Defendants must have otherwise affirmatively misled Azzil into

25

believing "that filing a claim was unnecessary to have its claim satisfied." *See Imperial News Co., Inc.*, 905 F.2d at 645.  The record is devoid of any evidence of such affirmative conduct.

The remaining question is whether Defendants' statements that they would "look into" resolving Azzil's concerns are sufficient to invoke estoppel.  Azzil points to a series of communications, mostly with NYA, where it notified NYA that it needed NYA to move these railcars and needed access to them.  (*See* DE 74-23; DE 74-26.)  NYA responded stating it would address this issue, thus, allegedly leading Azzil to believe it was being addressed.  (*See* DE 74-25; DE 74-26; Oral Argument at 10:49-51.)  Defendants claim these statements cannot be characterized as misleading since there was no mention of claims, liability, or loss.  (DE 79 at 8.) Defendants argue these were run of the mill communications regarding service issues that carriers have all the time, and these could not give rise to Carmack notice or else it would defeat the purpose of the strict notice requirements.

Taking all reasonable inferences in Azzil's favor, perhaps a reasonable juror could find that given the parties' business relationship, and the statements notifying them that the issues were being addressed, that Azzil was reasonably under the impression that no formal claim needed to be filed in order to have its claims satisfied while those discussions were ongoing.  But that is not all.  On May 2, 2019 CP expressly informed Azzil by letter in response to a mediation demand that:

> Azzil is required to comply with the claim procedures set out in CP's Tariff 1 …
> CP has no record of a disputed or unresolved claim for loss or delay filed by Azzil.
> If you believe this to be inaccurate, please provide evidence of claims filed in
> accordance with Tariff 1.

(DE 76-2 at ¶ 52; DE 77-5 at ¶ 52.)

Thus, resolving all reasonable inferences in Azzil's favor, and even assuming *arguendo* that until that point, Plaintiff had been misled to believe formal Carmack notice was unnecessary,

26

it was clear as of May 2, 2019 that CP did not forego the notice requirement.[5]  With several months left in the filing period, Azzil still did not file a timely claim.  Given this unambiguous letter, Azzil was indisputably on notice that more was required of it to satisfy its claim.  Therefore, the estoppel exception is inapplicable.

### ii.   ***Reasonable Diligence Exception***

Azzil states that despite reasonable diligence it could not have ascertained the extent of its loss within the nine-month filing period.  (DE 77 at 12.)  The second exception noted in *Pathway Bellows* is that if a party "could not, in the exercise of reasonable diligence, have ascertained the extent of its loss within the 9 month claim filing period, *untimely* filing of a *completed* claim might be viewed as excusable."  *Pathway Bellows*, 630 F.2d at 905 n.10 (emphasis added).

First, Defendants correctly argue that this exception may excuse the *untimely* filing of a *completed* claim but does not allow Azzil to forego filing a claim altogether.  Azzil was still required to file a claim, even just a partial claim, that otherwise met the Carmack notice requirements.  In *Rock Salt II*, the court noted that the plaintiff "did not file *any* claim" within the applicable nine-month period, and even if the plaintiff "could not have known the full extent of its damages earlier, it has offered no explanation why it could not have at least filed a partially completed claim sooner, setting forth the shipments in question, and supplemented the claim later when [plaintiff] became able to calculate its damages precisely."  *Am. Rock Salt Co., LLC v. Norfolk S. Corp.*, 387 F. Supp. 2d 197, 205 (W.D.N.Y. 2005).  The same is true here, notwithstanding Azzil's alleged inability to

---

[5] Defendants also note that the bankruptcy court found, to the extent Azzil suggests as much, the mediation notice did not satisfy Carmack notice.  *See In re Lizza Equip. Leasing, LLC*, 614 B.R. 653, 665 (Bankr. D.N.J. 2020).

precisely calculate damages, Azzil could have filed notice, albeit imperfect notice, meeting the remaining notice requirements.

Second, Azzil has not provided any evidence that it exercised reasonable diligence in ascertaining its damages, or that, it was impossible to determine, even partially, the amount to be claimed. *See Consol. Rail Corp. v. Primary Indus. Corp.*, 868 F. Supp. 566, 580 (S.D.N.Y. 1994) ("Primary Coal has neither provided evidence of its reasonable diligence nor demonstrated why these damages were impossible to assess during the nine-month period."). To supports its argument, Azzil notes that the Agreement terminated in January 2019 and at that time, over 100 of 150 rail cars were still either at Whitehall, NYA's Hicksville terminal, or Fresh Pond. (DE 74-28.) Thus, Azzil alleges those railcars were not available for Azzil to use as part of its business to ship stone. (DE 77 at 13.)

Azzil then points to the deposition testimony of its President Carl Lizza, to support the assertion that the losses due to Defendants' breach were "incalculable." (DE 77 at 13 (citing DE 75-2 at 205-06).) A review of the portion of that testimony reflects that Lizza testified that Azzil had to pay union employees that waited around to unload railcars that never arrived, which cost money, which was part of the debt incurred by Azzil. (DE 75-2 at 205.) Lizza then stated that Azzil was in bankruptcy in part due to the rail situation, and the quarry was being sold at auction. (DE 75-2 at 206.) Lizza also states: "That's incalculable, the bankruptcy portion, the legal fees, all the other nonsense that we're dealing with." (DE 75-2 at 206.) Lizza goes on to state:

> So, yeah, that's the debt, yes; when you don't generate the revenue and you don't move and you don't make the sales because -- you make all the stone but it doesn't get there and you lose your customers, you know, cash flow is very important and, you know, it's a very difficult thing . . . .

(DE 75-2 at 206.)

Though Lizza states that the entirety of Azzil's losses were incalculable, the evidence presented does not support Azzil's assertion that all losses attributable to Defendants' alleged delays were incalculable.  Even if some of its losses were not quantifiable, it does not necessarily mean none were.

Further, to invoke this exception, Azzil cites to a Western District of North Carolina case, *Taylor v. Mayflower Transit, Inc.*, 161 F. Supp. 2d 651 (W.D.N.C. 2000).  Azzil points out that there the court found genuine issues of material fact precluding summary judgment as to whether plaintiffs, despite reasonable diligence on their part, were unable to determine the extent of loss within the nine-month period.  *Id.* at 665.  The court stated that the plaintiffs had contracted with defendants to both assist with moving as well as with unpacking, and there were around 1,000 boxes that plaintiffs needed to unpack, which they contend they did as diligently as humanly possible to determine the damages to the items.  *Id*.  There, plaintiffs contended it took six months just to unpack, which was insufficient to ascertain damages.  *Id*.  But Azzil makes no connection to its damages or assertion of diligence here.  Azzil's assertion that many of its railcars were unavailable to it does not explain its reasonable diligence in determining damages, nor the impossibility of estimating any portion of its damages caused by the delay.  Nor, does it excuse the failure to file an incomplete claim that otherwise satisfies Carmack notice.

Moreover, Defendants note that Azzil's unsupported assertion that its losses were incalculable is belied by the calculation of damages Azzil sets forth in this suit, which are primarily based on $17 million in lost gross revenue for an alleged contract that it lost back in February 2019 (DE 74-29 at 2), and $2 million in alleged lost profits it would have allegedly received between 2017-2019.  (DE 79 at 10-11.)  Defendants argue that these amounts were

calculated by Azzil by multiplying the shortfall against the average sales price minus costs, a method available to it at any time.  (DE 79 at 10-11.)

At minimum, the value of the alleged lost contract was known to Azzil within the filing period.  The multi-year proposal to provide stone to the LIRR 3rd Track Contractors is dated December 10, 2018, and the Agreement with Defendants was expired as of January 2019.   (DE 74-29 at 2; DE 77-5 at ¶ 30.)  This undercuts the notion that Azzil could not determine any amount of damages with reasonable diligence.  And Azzil provides no feasible explanation, except for pointing to the parties' attempt at mediation, for why it did not file a partial claim noting these figures, which were discernible long before Azzil eventually filed the Complaint.

Lastly, Azzil argues that Carmack notice is there to trigger the carrier's obligation to promptly investigate the claim, and that Azzil's repeated notification identifying shipments by car number sufficiently triggered this duty.  (DE 77 at 14.)  Azzil cites to an unpublished Fourth Circuit and Eastern District of North Carolina case for this proposition (*see* DE 77 at 14).  Defendants argue that there is no duty to investigate in the Second Circuit and Azzil offers no authority to the contrary.  (DE 79 at 10.)  Additionally, the cases cited by Azzil involved notice of a different nature than the communications here.  *See Alstom Power, Inc. v. Norfolk S. Ry. Co.*, 154 Fed. Appx. 365, 368 (4th Cir. 2005) (plaintiff's attorney submitted an 11-page letter asserting a claim under the Carmack Amendment for damages caused by delayed deliveries); *Chapman v. Allied Van Lines, Inc.*, 2018 WL 701627, at *7 (E.D.N.C. Feb. 2, 2018) (plaintiff sent emails in which it noted the specific type of damages, later submitted a repair estimate, and sent a complaint indicating that plaintiff asserted defendant was liable for alleged losses and damage).

Notice was required under the Agreement and the Carmack Amendment, that much the parties agree on.  Azzil, concededly, failed to provide strict Carmack notice. The Court finds that Azzil has not offered evidence from which a reasonable juror could find that Azzil is entitled to any of the judicially recognized exceptions to absolve it of that failure.

Azzil's claims are time-barred and Defendants' motion for summary judgment is granted given the Court's finding (1) that Azzil's breach of contract claims are preempted by the Carmack Amendment, (2) that Defendants did not waive the preemption defense, (3) that Azzil did not satisfy the strict notice requirements under the Agreement and Carmack Amendment, and (4) that no exception to the strict notice requirements applies.

The Court is mindful that although it may seem that strict application of the requirements under the statute cause hardship to Azzil, the Supreme Court has advised time and time again that "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980); *accord McNeil v. United States*, 508 U.S. 106, 113 (1993); *Halstrom v. Tillamook County,* 493 U.S. 20, 31 (1990).  "Procedural requirements . . . are not to be disregarded by courts out of a vague sympathy for particular litigants."  *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 (1984).

## CONCLUSION

For the foregoing reasons, Azzil's Motion for Summary Judgment (DE 74) is DENIED, and Defendants' Cross-motion for Summary Judgment (DE 76) is GRANTED in its entirety, and Azzil's claims are hereby dismissed.  The Clerk of the Court is hereby directed to enter judgment accordingly.

Dated: Central Islip, New York
       May 10, 2023

                                        S O   O R D E R E D:

                                        /S/ *James M. Wicks*

                                           JAMES M. WICKS
                                        United States Magistrate Judge